Nita A. RISK, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

No. IP 98–698 C B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 29, 1999.

**1136**

---

Richard L. Darst, Mantel, Cohen, Garelick & Reiswerg, Indianapolis, IN, for plaintiff.

W. Perry Brandt, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Stueve Llp, Kansas City, MO, Susan B. Tabler, Ice Miller Donadio & Ryan, Indianapolis, IN, for defendant.

### *ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S PARTIAL MOTION TO DISMISS*

BARKER, Chief Judge.

Plaintiff, Nita A. Risk ("Risk"), alleges that her employer, defendant Ford Motor Company ("Ford"), discriminated against her on the basis of her sex, female, and

retaliated against her for complaining about alleged sexual discrimination and harassment, in violation of Title VII of the 1964 Civil Rights Act ("Title VII"). Ford comes before us on its partial motion to dismiss, contending that a number of Risk's claims are barred as untimely since they allegedly occurred more than 300 days prior to Risk's filing of her charge with the Equal Employment Opportunity Commission ("EEOC"). Ford also contends that a number of Risk's claims are barred since they allegedly fall outside the scope of her EEOC charge. For the reasons discussed, we *GRANT IN PART* and *DENY IN PART* Ford's partial motion to dismiss.[1]

### Relevant Background

The resolution of this dispute hinges on a narrow and straightforward inquiry—the timing and scope of Risk's EEOC charge. Hence, we dispense with a complete rendition of the facts alleged, and instead proceed directly to a comparison of the EEOC charge and Risk's allegations in her amended complaint. Nita Risk has worked at Ford Motor Company since 1989, when she joined Ford as an "assembler." *See* Am.Compl. ¶ 6. In June 1996, she bid for and received a job as a "B & K operator" in Department 79, where she works today. *Id.* ¶ 25. The subject of this lawsuit primarily involves Rush's employment at Ford during the period between 1989 and June 1996. *Id.* ¶¶ 16–30.

On January 23, 1996, Risk filed a Statement of Complaint with the City of Indianapolis Division of Equal Opportunity, alleging that a week earlier on January 16, 1996, Ford had discriminated against her on the basis of sex by transferring her out of her department and placing her on a different shift for "no apparent reason." *See* Def.'s Mem.Supp.Mot. Dismiss (Ex. A, Risk's City of Indianapolis charge).

On July 30, 1996, approximately six months later, Risk filed a charge of discrimination against Ford with both the EEOC and the Indiana Civil Rights Commission ("ICRC"). *Id.* (Ex. B, Risk's EEOC/ICRC charge).[2] A blank EEOC complaint form typically requires an aggrieved party to check the appropriate box(es) specifying the basis of his/her claim of discrimination. Risk checked two boxes, one for discrimination based on "sex," the second for discrimination based on "retaliation." *See* Def.'s Mem.Supp. Mot. Dismiss (Ex. B, Risk's EEOC charge). A general EEOC complaint form also prompts a complaining party to specify the "earliest" and "latest" date that the "discrimination took place," requiring the complainant to check a box entitled "continuing violation," if appropriate. *Id.* Risk checked that box and listed the dates of discrimination as 09/01/94 (earliest) and 07/30/96 (latest). *Id.* Risk described the "particulars" of her complaint as follows:

> I began working as an Assembler for Respondent in January 1989, [sic] In approximately August 1994 or September 1994, I filed a grievance against respondent because of a discriminatory practice used in assigning employees to overtime work in my former work de-

---

**1.** In the alternative, Ford suggests that we convert its partial motion to dismiss to a motion for partial summary judgment, given that Ford attaches two documents to its motion—Risk's July 30, 1996 EEOC charge and her January 23, 1996 charge filed with the City of Indianapolis. Ford correctly notes that documents a defendant attaches to a motion to dismiss may be considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to plaintiff's claim. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). Risk does not dispute that we may consider these attachments as part of Ford's partial motion to dismiss, nor does she contest that the attachments are referred to in her amended complaint and are central to her claims. *See* Am.Compl. ¶¶ 24–30. Accordingly, we find it unnecessary to convert Ford's partial motion to dismiss to a motion for partial summary judgment.

**2.** Risk's filed her Charge of Discrimination with both the ICRC and the EEOC, although for convenience we will refer to the joint ICRC/EEOC charge as simply the EEOC charge.

partment 58. After filing the grievance, Charlie Thompkins, former Superintendent, made comments to several individuals that he was going to get me for filing the grievance. In approximately March 1994, Thompkins had my job reclassified to a Material Handlers position. This caused me to be moved to another position in the department. In January 1996, I was forced out of the department because of a reduction in force. Co-workers with less seniority and different job classifications were allowed to remain in the department. Since being forced out of the department, two assembley [sic] employees have been assigned to my old work department 58. I believe that Respondent has discriminated against me in retaliation for complaining about a discriminatory practice and because of my sex, Female [sic] in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Id.*

Therefore, when read liberally, Risk complains of the following conduct in her EEOC complaint: (1) sex discrimination in August/September 1994 caused by Ford's method of allocating overtime, (2) sex discrimination and retaliation in March 1994 when superintendent Thompkins reclassified her job to a material handlers position, resulting in her intra-departmental move, (3) sex discrimination and retaliation in January 1996 when Ford transferred Risk out of department 58, but allowed less senior employees (we would infer male employees) to remain in the department and transferred two other employees into department 58 as assemblers.

On February 24, 1998, the EEOC issued Risk notice of her right to sue Ford within 90 days of her receipt of the notice, which Risk did by filing her complaint on May 22, 1998. *See* Am.Compl ¶ 29.

On August 31, 1998, Risk filed her amended complaint, contending in two counts that Ford both discriminated against her on the basis of sex and retali-

ated against her for "opposing sex discrimination and sexual harassment." Am. Compl. ¶¶ 31–34. First, she alleges that in August 1994, while an assembler in department 58, she filed a grievance complaining about "sex discrimination" due to Ford's method of awarding overtime to her male counterparts. *Id.* ¶ 9. Specifically, she claims that she filed a grievance in August 1994, complaining that a male employee, Randall Cartwright, received 19 hours of overtime to work her job, while Ford denied her those 19 overtime hours. *Id.* Risk contends that superintendent Thompkins disapproved when female employees filed grievances and that he, upon receiving her grievance, "tore it up and threw it in the trash." *Id.* ¶¶ 10–11.

Risk further contends that two weeks after this incident, Ford awarded a second male employee, Ruel Melton, 19 hours of overtime to work her job while again denying her that overtime. *Id.* ¶ 12. Risk filed a second grievance, this time with her union, complaining about "the different treatment of her" compared to Mr. Melton. *Id.* ¶ 14. She claims she won her grievance in November 1994, requiring Ford to award her 19 overtime hours. *Id.* ¶ 14. Risk contends that Thompkins became angered by her victory, stating that "he was going to get her for filing the grievance, and he took steps to try to get her out of the department." *Id.* ¶¶ 15–16.

Second, in addition to Risk's allegations of sex discrimination due to Ford's allocation of overtime, she claims that Ford discriminated and retaliated against her in January/February 1995. *Id.* ¶ 17 She alleges that in January/February 1995, Ford placed a male employee, David Basso, in her job and "reclassified" her duties, resulting in her intra-departmental transfer "to work on a table with friends of" superintendent Thompkins. *Id.* ¶¶ 18–19. Risk alleges that while she worked at the "table," her co-workers "cussed, made sexual statements to her, passed body gas to harass her, spit tobacco on her work parts, left pants fly open, called her an old wom-

an, told her that no one wants to have sex with her, and engaged in other sexual harassment and retaliation." *Id.* Risk claims that she "complained to Ford about the sex discrimination, including sexual harassment." *Id.*

Third, Risk contends that Ford discriminated and retaliated against her on or about January 11, 1996 by transferring her out of her department (she apparently was still in department 58 when transferred) "to a line as an assembler." *Id.* ¶ 20.

Fourth, Risk complains that "a week" after her January 11 transfer, Ford transferred a male employee, David Basso, to a higher paying job in the "Clean Room, department 75," instead of transferring Risk, who allegedly had higher seniority, to the higher paying job. *Id.* ¶ 21.

Fifth, Risk contends that "shortly thereafter," Ford "brought back" a male employee, William Taylor, to Risk's "old job" as an assembler in department 58, instead of transferring Risk to her previous position in department 58. *Id.* ¶ 22. Risk claims that she complained to Ford and the union about these various transfers, and that she complained "about the sex discrimination" by filing her charge with the City of Indianapolis on January 23, 1996. *Id.* ¶ 24.

Finally, Risk apparently alleges that in June 1996, Ford discriminated and/or retaliated against her by resisting her efforts to obtain the job of "B & K operator" in department 79, and by falsely representing that Ford was experiencing a reduction in force in that department. *Id.* ¶ 25. She asserts that her complaint to the union, and its ensuing protests, resulted in Ford's awarding her the B & K operator job, a position she presently holds. *Id.* Risk concludes in her amended complaint that on July 30, 1996, she complained to the EEOC and the ICRC about "the sex discrimination and retaliation." *Id.* ¶ 26.

Based on the comparative allegations in Risk's EEOC charge and her subsequent amended complaint, we are armed with the necessary background to turn to the merits of the parties' contentions.

### Standard of Review

On a motion to dismiss pursuant to Rule 12(b)(6), we must determine whether the plaintiff's complaint states a claim upon which relief can be granted. *See* Fed. R.Civ.P. 12(b)(6). The Court must examine the sufficiency of the plaintiff's complaint, not the merits of her lawsuit. *See Triad Assoc. v. Chicago Housing Auth.,* 892 F.2d 583, 585 (7th Cir.1989). Accordingly, the motion " 'should not be granted unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.' " *See Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1175 (7th Cir.1999) (*quoting Thomason v. Nachtrieb,* 888 F.2d 1202, 1204 (7th Cir.1989)); *see also Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Jones v. General Elec. Co.,* 87 F.3d 209, 211 (7th Cir.), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 510, 136 L.Ed.2d 400 (1996). When reviewing a motion to dismiss, we accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 165, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993); *Dawson v. General Motors Corp.,* 977 F.2d 369, 373 (7th Cir.1992). However, we are not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law. *See R.J.R. Servs., Inc. v. Aetna Cas. & Sur. Co.,* 895 F.2d 279, 281 (7th Cir.1989).

### The 300–Day Limitations Period

Ford contends that the claims based on paragraphs 9 through 19 of the amended complaint are barred by the applicable statute of limitations, asserting that the alleged facts supporting these claims occurred more than 300 days before Risk filed her EEOC charge. Risk rejoins that a number of her claims do in fact fall within the 300–day limitations period, and that

those claims based on alleged facts occurring outside the 300–day window are saved by the "continuing violations" exception to the statute of limitations. Risk also contends without citation to legal authority that retaliation claims brought pursuant to Title VII simply are not governed by the 300–day limitations period. We conclude that aside from Risk's claim of sexual harassment, the 300–day statute of limitations bars Risk's claims of discrimination and retaliation based on the 1994 awards of overtime and her January/February 1995 reclassification and transfer to the "table."

 Timely exhaustion of administrative remedies is a condition precedent to filing suit under Title VII. *See Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 511 (7th Cir.1996); *Perkins v. Silverstein,* 939 F.2d 463, 469–70 (7th Cir.1991). As a general matter, Title VII requires that a claimant file a charge with the EEOC within 180 days of an allegedly discriminatory act. *See* 42 U.S.C. § 2000e–5(e). "However, if a claimant initially institutes proceedings with a state or local agency that possesses the authority to address the alleged discrimination, the time limit for filing with the EEOC is extended to 300 days." *Russell v. Delco Remy Div.,* 51 F.3d 746, 750 (7th Cir.1995) (*citing Equal Employment Opportunity Commission v. Commercial Office Prods. Co.,* 486 U.S. 107, 111, 108 S.Ct. 1666, 100 L.Ed.2d 96

(1988)). Therefore, "[i]n a deferral state, such as Indiana, a charge must be filed within 300 days of the occurrence of the act that is the basis of the complaint." *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 445 (7th Cir.1994); *see Russell,* 51 F.3d at 750–51 (noting that Indiana vests the ICRC with authority to pursue charges of discrimination, and discussing the effect of worksharing agreements between the EEOC and state agencies). In part, this limitations period serves to " 'protect employers from the burden of defending claims arising from employment decisions that are long past.' " *Mull v. ARCO Durethene Plastics, Inc.,* 784 F.2d 284, 291 (7th Cir.1986) (*quoting Delaware State College v. Ricks,* 449 U.S. 250, 256–57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980)).

In the case before us, Risk filed her charge with the EEOC and ICRC on July 30, 1996. Thus, the 300–day period would encompass any acts of discrimination which occurred between October 4, 1995 and July 30, 1996. *See Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1163–64 (7th Cir.1994) (noting that, because the discrimination charge had been filed with the EEOC on June 24, 1992, the court could consider "allegations of discriminatory conduct that transpired between August 29, 1991, and June 24, 1992"). Aside from Risk's erroneous contention that Title VII retaliation claims are not subject to this limitation,[3] the parties do not dispute that

---

**3.** Risk simply misstates the law when baldly asserting that "[f]or a retaliation claim, there is no requirement that the complaint of discrimination be within the 300 day period." Pl.'s Mem.Opp.Def.'s Mot. Dismiss at 14; *see, e.g., O'Rourke v. Continental Cas. Co.,* 983 F.2d 94, 97 (7th Cir.1993) (finding that employee could not amend his age discrimination complaint to include a retaliation claim because, among other reasons, the alleged retaliation occurred beyond the 300–day limitations period); *Luddington v. Indiana Bell Tel. Co.,* 796 F.Supp. 1550, 1565 (S.D.Ind. 1990) (barring Title VII retaliation claims based on alleged acts that occurred beyond the 300–day limitations period), *aff'd,* 966 F.2d 225 (1992). Risk may be confusing the timeliness requirement with the appropriate scope of an EEOC charge, which often never

includes a retaliation claim since the employer allegedly retaliates *after* and because the employee filed the EEOC charge. In that factual scenario (which does not exist here), the 300–day period before the filing of the EEOC charge becomes largely moot for purposes of the retaliation claim, which the employee simply includes in his/her timely federal district court complaint (after receiving notice of her right to sue), instead of filing a second EEOC charge. *See McKenzie v. Illinois Dep't of Transp.,* 92 F.3d 473, 482–83 (7th Cir.1996) (barring a number of plaintiff's retaliation claims as beyond the scope of her EEOC charge, finding that, unlike the situation where retaliation occurs after the filing of the EEOC charge, the plaintiff suffered the retaliatory acts prior to filing her EEOC

the 300–day limitations period applies in this case, calculated from the date Risk filed her EEOC charge. *See* Pl.'s Mem. Opp.Def.'s Mot. Dismiss at 2, 13–21 (arguing that a number of Risk's discrimination claims fall within the "300 day requirement" and that those claims beyond the 300–day period are saved by the continuing violations exception the statute of limitations); Def.'s Mem.Supp.Mot. Dismiss at 7.

Ford contends that because the acts alleged in paragraphs 9 through 19 of Risk's amended complaint occurred before October 4, 1995, any discrimination, retaliation or harassment claims based on those alleged acts are time-barred. *See* Def.'s Mem.Supp.Mot. Dismiss at 7. Specifically, those paragraphs pertain to Ford's 1994 award of overtime to two male employees and Risk's January/February 1995 reclassification and transfer to a "table" where male employees allegedly sexually harassed her. *See* Am.Compl. ¶¶ 9–19.

In response, Risk never disputes that both the denial of overtime and her reclassification/transfer occurred over 300 days before she filed her EEOC charge. Instead, she invokes the continuing violations doctrine, contending that she did not realize that Ford discriminated against her until some point within the 300–day limitations period because Ford "engaged in a 'covert' practice of sex discrimination."[4] Pl.'s Mem.Opp.Def.'s Mot. Dismiss at 18–20. We disagree and find that Risk has gone too far in her complaint, pleading facts that demonstrate that she knew or should have known that these events were

discriminatory when they (admittedly) occurred outside the limitations period.[5]

■ " 'The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that ends within the limitations period.' " *Garrison v. Burke*, 165 F.3d 565, 569 (7th Cir.1999) (*quoting Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir.1992) (detailing three continuing violation theories)); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 663 (7th Cir.1997). The principle underlying the continuing violation doctrine "is that the plaintiff may not base [a] suit on conduct that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on that conduct, as in a case in which the conduct could constitute, or be recognized, as actionable [discrimination] only in light of events that occurred later, within the period of the statute of limitations." *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167 (7th Cir.1996).

The Seventh Circuit has recognized three theories that will support an application of the continuing violations doctrine. *Selan*, 969 F.2d at 564 The first theory encompasses decisions where the employer's decision-making process takes place over a period of time, making it difficult to determine the actual date of the allegedly discriminatory act. In such instances, the

---

charge and should have included them in those administrative charges).

**4.** Risk never pleads the continuing violation doctrine in her complaint, an omission that some courts consider fatal to the claim. *See, e.g., Saldana v. City of Chicago*, 972 F.Supp. 453, 457 (N.D.Ill.1997) ("If a plaintiff intends to rely on the continuing violation doctrine, the court concludes that it must be pleaded in the complaint along with the factual basis supporting one of the three methods … for establishing the applicability of the doctrine."). In any event, Risk has failed to

allege facts to support the theory, either in her amended complaint or in her response.

**5.** We have no occasion to consider whether equitable estoppel or equitable tolling saves Risk's untimely claims, as Risk fails to allege such theories in her pleadings. Nonetheless, based upon our own review of the facts alleged in Risk's complaint, we find no basis to apply these doctrines to the case before us. *Cf. Hentosh v. Herman M. Finch Univ. of Health Sciences*, 167 F.3d 1170 (7th Cir. 1999).

statute of limitations begins running on the claim when the plaintiff knows that the decision has been made. *See Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1058 (7th Cir.1994).

Risk finds no solace in this first theory, nor does she attempt to do so. The facts alleged in Risk's amended complaint demonstrate that she clearly knew in 1994 that two male employees received overtime hours and that she did not. Of course, she also knew of her reclassification and transfer when those events occurred in January/February 1995.

The second continuing violation theory involves cases in which the employer has an express, openly espoused policy that is alleged to be discriminatory. *See Selan,* 969 F.2d at 565. Risk does not claim that Ford retained such a policy.

Finally, a plaintiff can show a continuing violation where an employer covertly follows a practice of discrimination over a period of time. *See Jones,* 42 F.3d at 1058. Under this theory, also known as a "serial" violation, the plaintiff realizes that she is a victim of discrimination only after a series of acts has occurred, with the limitations period beginning to run when the plaintiff gains such insight. *Id.* Yet, if the plaintiff knew, or " 'with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed' her, she must sue over that act within the relevant statute of limitations." *Id. (quoting Moskowitz v. Trustees of Purdue Univ.,* 5 F.3d 279, 281–82 (7th Cir.1993)).

Risk advocates this "covert" theory in her response to Ford's motion to dismiss, claiming that she did not realize the sexually discriminatory nature of the 1994 denial of overtime until some unspecified time after October 4, 1995. She likewise claims that she did not understand the retaliatory nature of her January/February 1995 reclassification and transfer until some unspecified point within the limitations period. We find Risk's claims unavailing, as the facts alleged in Risk's own complaint demonstrate that these alleged discriminatory acts reasonably could have been expected to form the basis of a lawsuit when they occurred prior to the October 4, 1995 limitations deadline.

■ Risk alleges in her amended complaint that after learning in August 1994 that Ford allocated overtime to Randall Cartwright to work her job, she filed a grievance complaining about "sex discrimination." Am.Compl. ¶ 9; *see Enright v. Illinois State Police,* 19 F.Supp.2d 884, 888 (N.D.Ill.1998) (continuing violations theory did not save barred failure to promote claims partially because plaintiff had considered filing a formal complaint after the promotion denials). She also claims that Thompkins disapproved when female employees filed grievances, which compelled him to tear up her complaint and throw it "in the trash" upon receiving it. Am. Compl. ¶ 11. She claims that Ford never processed this first grievance.

Undeterred by Thompkins' histrionic behavior, Risk filed a second grievance two weeks later when she learned that Ford again awarded her overtime hours to another male employee, Ruel Melton. *Id.* ¶ 14. This time she filed the grievance with her union, complaining that she had been treated differently than her male counterpart. *Id.; see Jones,* 42 F.3d at 1058 (failure to promote claims barred since (1) plaintiff knew or should have known that she had not received the promotion and another person had, and (2) plaintiff thought at the time of the promotions that some of the decisions may have been discriminatory). Based on these alleged facts, it is patently clear to us that not only did Risk believe in 1994 that the awards of overtime were discriminatory in nature, but that she also held the belief with sufficient fortitude to defy her supervisor's disapproval and file her second grievance with the union despite his boorish display in response to her first complaint. *See Dasgupta v. University of Wisconsin Bd. of Regents,* 121 F.3d 1138,

1139–40 (7th Cir.1997) (noting that since plaintiff's claims of discrimination in pay and promotion were "outright" and "would have supported a Title VII suit" when the promotion denials occurred, a continuing violation theory did not salvage the plaintiff's time-barred claims).

Moreover, Risk alleges in her amended complaint that after she won her second grievance in November 1994, resulting in Ford awarding her 19 overtime hours, "Ford became angry with [ ] Risk because she had complained about the different treatment of her and the male employees and because Risk won her grievance." Am.Compl. ¶ 15. She further alleges that Thompkins "stated that he was going to get [Risk] for filing the grievance." Id. ¶ 16. On the heels of this statement and Ford's anger at her winning a sexual discrimination grievance, Risk found her job reclassified (with a male employee assuming her job no less), resulting in her transfer to a "table" surrounded by male co-workers who allegedly harassed her. Even if Thompkins had not destroyed Risk's first grievance and threatened retaliation, an alarm bell should have alerted Risk, who had just filed two internal sex discrimination complaints, that an "angry" Ford acted in retaliatory fashion by transferring her out of her job and by replacing her with a male employee. We cannot help but surmise how Risk either did not actually know under these circumstances, or could not have determined with the exercise of reasonable diligence, that she had a possible claim of discrimination or retaliation based upon her reclassification and transfer. See Lacy v. Ameritech Mobile Communications, Inc., 965 F.Supp. 1056, 1065 (N.D.Ill.1997) (finding that plaintiff "knew, or should have known, that he had not been considered for a promotion and that other individuals had been. This was enough to put [plaintiff] on notice that he had a possible claim … [plaintiff may not rely on any] continuing violation theory to revive his [ ] failure to promote claims"), aff'd, 142 F.3d 440 (7th Cir.1998). In short, the facts alleged in Risk's own amended complaint demonstrate that Ford's acts of denying her overtime and reclassifying/transferring her scarcely qualify as the type of "covert" practices of discrimination that trigger the continuing violations doctrine.[6]

Further, Risk makes no attempt to demonstrate that the 1994 denial of overtime and the 1995 reclassification/transfer "related closely enough" to an act within the limitations period to constitute a serial violation. Doe, 42 F.3d at 446. Indeed, these events strike us the exact type of "discrete, isolated, and completed acts" that must be regarded as individual, not serial, violations. Id. Indeed, Risk never even bothers to specify which alleged violation during the limitations period serves as the anchor for the earlier conduct. While we realize that Risk alleges various forms of sexual discrimination within the limitations period, Risk never attempts to analyze how the alleged 1996 violations, the 1994 overtime denial and the 1995 reclassification/transfer constituted one continuous act. See Enright, 19 F.Supp.2d at 887 (noting that in assessing the serial violation theory, parties and courts analyze three factors in determining if conduct is part of a continuing violation, including subject matter, the frequency, and the degree of permanence) (citing Selan, 969 F.2d at 565). After all, Risk continues to

---

6. Risk also maintains without citation to legal authority that her allegations in the complaint must be a continuing violation simply because she checked the continuing violations box on her EEOC charge. See, e.g., Noreuil v. Peabody Coal Co., 96 F.3d 254, 259 (7th Cir.1996) ("Of course, simple technicalities such as '[w]hat boxes, for instance, are checked on the EEOC form do not necessarily control the scope of a subsequent complaint.' ") (quoting Kristufek v. Hussmann Foodservice Co., Toastmaster Div., 985 F.2d 364, 368 (7th Cir. 1993)). However, as we discussed previously, the proper inquiry turns on a more substantive comparative analysis of the allegations in the EEOC charge and the subsequent complaint.

work at Ford and actually received the promotion that she "bid for" when Ford awarded her the position of B & K operator in June 1996. Am.Compl. ¶ 25. We detail this additional fact only to point out that the application of the serial violation theory is not obvious, and in the absence of Risk's attempting to demonstrate the "continuing" nature of the alleged serial violation, we find it reasonable to expect Risk to have sued before the statute of limitations ran on acts whose discriminatory characters were apparent at the time they occurred. Accordingly, because Risk's allegations involving the 1994 denial of overtime and the 1995 reclassification and transfer to the "table" are time-barred, we *GRANT* Ford's motion to dismiss as to those claims.

As for the alleged harassing comments that Risk endured at the "table," Risk does *not* admit that they occurred outside the limitations period, contrary to Ford's representation. *See* Pl.'s Mem.Opp.Def.'s Mot. Dismiss at 6–7. Instead, Risk contends that male employees subjected her to such comments well within the October 4, 1995 limitations deadline, as she worked at the table from January/February 1995 until January 1996. *Id.* Indeed, Risk's complaint merely states that she assumed her position at the table in January/February 1995, after which male employees began harassing her. One possibility is that discovery reveals that all the alleged conduct occurred after October 4, 1995 and within the limitations period. *Cf. Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 344–45 (7th Cir.1999) (finding that acts of sexual harassment are subject to Title VII's 300–day statute of limitations unless saved by the continuing violation doctrine). It is also possible that a few acts of minor harassment occurred in January/February 1995, but that more serious acts of harassment did not occur and alert Risk to their combined harassing effect until after October 1995. *See Minor v. Ivy Tech State College,* 174 F.3d 855 (7th Cir.1999) (explaining that sexual harassment occurring prior to the limitations period may not

become apparent to a plaintiff until the more serious acts of harassment occur during the 300–day limitations period). Still another possibility is that all the alleged acts, or at least the most serious and obvious acts of alleged harassment, occurred prior to October 1995, such that Risk cannot find relief in the continuing violations doctrine by reaching back and imposing liability for acts beyond the 300–day limitations period. *See Hentosh v. Herman M. Finch Univ. of Health Sciences,* 167 F.3d 1170, 1175 (7th Cir.1999) (affirming district court's grant of defendant's motion to dismiss, and holding that district court correctly found that plaintiff's sexual harassment claims were barred by 300–day statute to limitations). We discuss these scenarios only to demonstrate that we are unable to conclude beyond doubt that Risk cannot prove any facts that would support her claim for sexual harassment. *Id.* at 1173. Unlike her time-barred claims of discrimination and retaliation, Risk has not plead herself out of court on this claim for relief, the merits of which Ford would have been able to challenge on summary judgment. Therefore, we decline to dismiss Risk's sexual harassment claim on statute of limitations grounds, although we note that Risk's victory is short-lived in light of our following ruling that her harassment claim is barred as beyond the scope of her EEOC charge.

### The Scope of the EEOC Charge

Ford contends that Risk's sexual harassment claim and the sex discrimination and/or retaliation claims based on paragraphs 17, 18, 21 and 25 of the amended complaint are barred as beyond the scope of her EEOC charge. Risk rejoins that if the acts alleged in these paragraphs are not actually contained in her EEOC charge, then they are at least reasonably related to it. We agree with Ford that the allegations set forth in paragraphs 18 and 25 of the amended complaint are barred as beyond the scope of Risk's EEOC charge, but we find that facts alleged in paragraph

21 of the amended complaint are reasonably related to the claims in Risk's EEOC charge.[7]

■ As a general rule, a Title VII plaintiff may not bring claims in a lawsuit that were not included in her EEOC charge. *See Harper v. Godfrey Co.*, 45 F.3d 143, 147–48 (7th Cir.1995); *Cheek v. Western & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994). The rule serves two purposes: (1) it affords the EEOC the opportunity to settle the dispute between the employee and employer, and (2) it puts the employer on notice of the charges against it. *See Harper*, 45 F.3d at 148 (*citing Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992)). "Although the rule is not jurisdictional, it is a condition precedent with which Title VII plaintiffs must comply." *Cheek*, 31 F.3d at 500.

■ Yet, because most EEOC charges are completed by laypersons rather than by lawyers, the plaintiff enjoys considerable leeway in fashioning her charge, as she need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint. *Id.* (*citing Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1195 (7th Cir.1992)). Hence, our circuit allows a Title VII plaintiff to include a claim in a federal district court complaint that was not brought in the EEOC charge if the plaintiff passes a two-part test: (1) the claim in the plaintiff's complaint must be "like or reasonably related" to the allegations in the EEOC charge, and (2) the claim in the plaintiff's complaint must be reasonably expected to grow out of an EEOC investigation of the EEOC charges. *Harper*, 45 F.3d at 148; *Cheek*, 31 F.3d at 500–501.

■ In regard to the first prong, a claim in the plaintiff's complaint is "like or reasonably related" to the allegations in the EEOC charge if there is a "factual relationship" between them. *Id.* This factual relationship means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals. *See Cheek*, 31 F.3d at 501.

■ Risk's claim of sexual harassment never clears this first hurdle, as her EEOC charge neither describes conduct involving sexual harassment nor implicates the individuals she later claims harassed her. Our circuit has held that claims of sexual harassment cannot be inferred from an EEOC charge of sexual discrimination simply because both theories pertain to discrimination:

> When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge. Ordinarily, a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination.

*Cheek*, 31 F.3d at 503. In *Cheek*, the plaintiff alleged in her EEOC charge both that her staff manager, Greg Petsovich, "constantly intimidated" her and that she was forced to pay her clients' insurance premiums, unlike her male counterparts who were not treated in such a manner. *Id.* at 500–01. The plaintiff also alleged in her EEOC affidavit that her staff manager treated her in a "hostile, inferior, unprofessional manner." *Id.* at 503. She concluded that she had been discriminated

---

**7.** We need not decide if the conduct alleged in paragraph 17 of the amended complaint (and the portion of paragraph 18 that specifies Risk's transfer to the "table") falls within the scope of the EEOC charge, given our previous ruling that Risk's claims of discrimination and/or retaliation based on her January/February 1995 reclassification and transfer to the

"table" are barred by the 300–day statute of limitations. *See* Am.Compl ¶¶ 17–18. We note, however, that Risk's EEOC charge, on its face, fails to mention any conduct occurring in January/February 1995. *See* n. 9; Def.'s Mem.Supp.Mot. Dismiss (Ex. B, Pl.'s EEOC charge).

against because of her sex. *Id.* at 500–01. In contrast, the plaintiff's complaint alleged that, among other forms of sexual discrimination, her district manager, Norman Crady, created a hostile work environment through his sexual harassment of her and other women in the office. *Id.* at 503. The court concluded that a harassment claim simply could not be "reasonably inferred from the allegations of sex discrimination in her EEOC charge." *Id.* Moreover, the court held that even if the EEOC charge could support a claim of sexual harassment against Petsovich, her claim still would be barred since her district court complaint faulted the conduct of a different employee, Crady. *Id.*

Likewise, Risk's claim of sexual harassment in her complaint cannot be reasonably inferred from anything alleged in Risk's EEOC charge, even when we examine her charge with the utmost liberality.[8] Risk advances a contorted explanation for how we should read her EEOC charge as reasonably related to her subsequent allegations regarding the offensive behavior of her colleagues at the table. She asserts that the EEOC agent who typed her EEOC charge incorrectly wrote that her transfer to the Material Handlers position occurred in "March 1994," instead of the true date of January/February 1995. Therefore, she claims that the "March 1994" transfer to the Material Handlers position, as described in her EEOC charge, actually is the same transfer as the "January/February 1995" transfer to the "table," as described in her amended complaint.[9] Based on this assumption, she concludes that after her transfer to the

table/material handlers position, the alleged harassing behavior (such as her fellow employees passing body gas and telling her that no one wants to have sex with her) simply represents her experience on the new job "in more detail." Pl.'s Mem. Opp.Def.'s Mot. Dismiss at 22.

We are inclined to credit Risk's explanation of the inaccuracy in her EEOC charge, especially when drawing inferences in her favor at this stage of the litigation. However, the glaring fact remains that her EEOC charge never describes any conduct remotely related either to sexual harassment generally or to the specific behavior of her fellow employees at the table. Even if Risk had stated in her EEOC charge that superintendent Thompkins discriminated and/or retaliated against her in January/February 1995 by reclassifying her job and transferring her to the "table," she failed to suggest that her fellow employees harassed her in any fashion whatsoever. Conjuring such an implication where none exists would frustrate the goal of giving the employer some warning of the conduct at issue and affording the EEOC and the employer an opportunity to attempt reconciliation without resort to the courts. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992) (holding that of the five forms of race-based discrimination alleged in plaintiff's complaint, four of the claims were properly presented to the EEOC, but finding the racial harassment claim barred as beyond the scope of the EEOC charge). Indeed, the alleged discriminatory behavior that Risk describes in her amended complaint is far from subtle, and she could have (and

---

8. Save for Risk's use of the phrase "sexual harassment" in her complaint, it is not obvious that she even intended to assert a claim for sexual harassment. Her complaint does not reveal if she is asserting harassment based on a hostile work environment or due to a supervisor's more direct harassment of extorting sexual favors. *See Minor v. Ivy Tech State College*, 174 F.3d 855 (7th Cir.1999). The ambiguity proves irrelevant, however, because Risk's EEOC charge fails to describe conduct that would fit into either category.

9. A common-sense read of the EEOC charge, which Risk presents chronologically, reveals that the March 1994 date may reflect a typographical error as Risk contends, as the date logically should have been typed, "March 1995." Yet, aside from the question as to why Risk did not catch the error after reviewing her draft EEOC charge and before signing her name to it, we are left to wonder why Risk did not pursue some corrective action with the EEOC, such as by sending a letter to the EEOC documenting the alleged error.

should have) included at least passing reference to it in her EEOC charge. "Ordinarily, a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination," and this case presents no exception. *Cheek,* 31 F.3d at 503.

Alternatively, Risk's EEOC charge and her amended complaint describe conduct of different individuals. Risk contends that her appointment to the table was "related to the efforts of superintendent Thompkins to get [Risk] out of his department." Pl.'s Mem.Opp.Def.'s Mot. Dismiss at 22. But that assertion merely underscores the degree to which her EEOC charge focuses on Thompkins, without alerting Ford, the EEOC, or us for that matter, that she felt aggrieved by the crude behavior of her co-workers. Specifically, Risk's amended complaint identifies her co-employees at the table as the perpetrators of the alleged offensive behavior. Her EEOC charge (as well as her amended complaint) focuses on former superintendent Thompkins as the Ford employee responsible for discrimination and/or retaliation when reclassifying her job and transferring her to the material handlers/table position. Hence, even if the allegations in Risk's EEOC charge somehow could support a claim of sexual harassment or retaliation related to the table, the claim would be against Thompkins, not Risk's co-workers.[10] *See Cheek,* 31 F.3d at 504. Accordingly, since the allegations in paragraph 18 of the amended complaint fall outside the scope of Risk's EEOC charge, we *GRANT* Ford's motion to dismiss Risk's claims of sex-based discrimination due to the behavior of her fellow employees at the "table."

▮ Next, Risk contends that the facts in her EEOC charge are reasonably related to paragraph 25 of her amended complaint, in which she alleges that even though Ford awarded her the position of B & K operator, Ford discriminated against her when it allegedly resisted placing her in the job after she bid for it in June 1996. *See* Am.Compl. ¶ 25. While it is unclear if Risk is even asserting a claim of discrimination based upon her efforts to obtain the B & K operator job, the putative claim is beyond the scope of her EEOC charge in any event. In her response, Risk's only analysis about the relatedness of the amended complaint to the EEOC charge regarding this claim is as follows: "[p]laintiff's present employment [as B & K operator] is always relevant. The efforts of [Ford] to try to deny plaintiff her present job are relevant to [Ford's] intent, motive, plan, pattern, and pretext, even though [Ford] was not successful in taking another adverse action against plaintiff." Pl.'s Mem.Opp.Def.'s Mot. Dismiss at 22.

In other words, Risk says nothing at all about the mutuality of conduct or actors in her EEOC charge and her amended complaint, and instead asserts an irrelevant argument concerning admissibility of evidence at trial. In regard to whether the EEOC charge and the amended complaint involve the same individuals, the amended complaint does not implicate Thompkins or his department in the context of the B & K operator position. On the contrary, in January 1996, Risk transferred out of Thompkin's department to "a line as an assembler." Am.Compl. ¶ 20; Def.'s Mem. Supp.Mot. Dismiss (Ex. A. Risk's City of Indianapolis charge). While working in that capacity, she apparently bid for and received the B & K operator position in department 79, a job also outside Thompkin's department. Thus, there is no clear connection between the actors responsible for her transfer out of department 58 and the actors involved in her transfer from a position outside department 58 to the job

---

**10.** As a general matter, the distinction between harassment by a co-worker or a supervisor is not a minor one in the vernacular of Title VII sexual harassment law. *See Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir.1998) ("An employer's liability for hostile environment sexual harassment depends upon whether the harasser is the victim's supervisor or merely a co-employee.").

of B & K operator. In the absence of Risk providing some explanation, we fail to see how the EEOC or Ford could reasonably determine from Risk's EEOC charge that she also felt aggrieved by the bidding process that resulted in her receiving the B & K operator job.

Additionally, Risk's EEOC charge does not describe the same conduct found in paragraph 25 of her amended complaint. The EEOC charge describes discriminatory practices related to department 58—awards of overtime and transfers of Risk and male employees to, from, and within department 58. The alleged conduct occurred in January 1996 or earlier, aside from the allegations that two employees had been transferred back to department 58 after Risk "was forced out of the department" in January 1996. In contrast, paragraph 25 describes alleged conduct occurring in June 1996, only one month before Risk filed her EEOC charge, yet Risk mentions nothing in her EEOC charge related to Ford's resistance in awarding her the B & K operator position.

Also, Risk's transfer to B & K operator is at least a step removed from department 58, as Risk had been working as an assembler outside department 58 when she bid for and received the B & K operator position in department 79. Put another way, department 58 had exited stage left well before Risk's claim regarding the B & K operator position entered the scene. Finally, Risk introduces an entirely new character in paragraph 25, a claim related to equal pay—"Plaintiff still does not make as much as she would have made" had she not been subjected to discrimination. Am. Compl. ¶ 25. This addition merely reinforces our conclusion that the subject matter of paragraph 25 of the amended complaint falls beyond the scope of Risk's EEOC charge, such that the goals behind resorting to administrative relief, notifying the employer and the EEOC of the charges leveled and promoting settlement, would be frustrated if we permitted these claims to survive. *See Rush*, 966 F.2d at

1110. Accordingly, we *GRANT* Ford's motion to dismiss Risk's claims of discrimination contained in paragraph 25 of her amended complaint.

▇▇▇ Finally, unlike the claims previously addressed, we find that the allegations in Risk's EEOC charge are like or reasonably related to the allegations in paragraph 21 of her amended complaint. Risk alleges in paragraph 21 that in January 1996, about one week after Ford transferred Risk out of department 58 to "a line as an assembler," Ford transferred a male employee with lower seniority from department 58 to a higher paying job in department 75 (the "Clean Room"). Am. Compl. ¶ 18. Similarly, in her EEOC charge, Risk claims that in January 1996, Ford forced her out of department 58 for discriminatory reasons, while co-workers with less seniority remained in the department. *See* Def.'s Mem.Supp.Mot. Dismiss (Ex. B, Pl.'s EEOC charge).

Thus, Risk's EEOC charge plainly puts Ford on notice that in January 1996, Risk felt aggrieved by her transfer from department 58 and by the comparative treatment of fellow employees with less seniority. One notable similarity between the EEOC charge and paragraph 21 of the amended complaint is that both describe conduct occurring during a finite period, January 1996. Further, both documents describe conduct involving personnel transfers out of Risk's former department 58. Therefore, both documents provided Ford and the EEOC with a definite time frame in which the conduct occurred (January 1996), the type of conduct at issue (transfers), a specific department involved (department 58), and the nature of the complaint (Ford's treatment of Risk vis-a-vis its treatment of less senior employees).

Given these similarities, we find that although the EEOC charge does not expressly describe the male employee's transfer out of department 58, that claim is derivative of Risk's alleged discriminatory transfer in January 1996. It directly follows that if Ford discriminated against

Risk sometime in January 1996 by forcing her out of department 58 to a less desirable position, then it also would not have transferred her to a higher paying position outside that department a week later. Ford reasonably could expect that transfers of male employees in January 1996 (in particular transfers of male employees in and out of department 58) would constitute the measuring stick by which Risk, the EEOC, or a court would compare Risk's alleged discriminatory transfer. Likewise, we find it more than reasonable to expect that Risk's claims regarding the Clean Room position would grow out of an EEOC investigation into the background encapsulating her EEOC charge that Ford discriminated against her in January 1996 by forcing her out of the department.

Moreover, Risk's alleged exclusion from the Clean Room job may very well implicate the same individual(s) as her transfer out of department 58, namely former superintendent Thompkins. Indeed, Risk's EEOC charge emphasizes the role that Thompkins allegedly played in her removal from the department. His concomitant recommendation of a less deserving male employee (also in his department) to the Clean Room position could have been part and parcel of the alleged discriminatory decision to jettison Risk from his department and dictate where she landed. In the end, Risk was required to provide sufficient specificity in her administrative charge so that the EEOC could perform its statutory duty, and when we apply a lenient standard in reading Risk's EEOC charge, we find that she has succeeded in doing so on this particular claim. *See Rush*, 966 F.2d at 1111. Accordingly, we *DENY* Ford's motion to dismiss Risk's claim of discrimination based on the allegations set forth in paragraph 21 of her amended complaint.

---

11. Risk's only remaining claims for trial are based on conduct alleged in paragraphs 20, 21 and 22 of her amended complaint.

*Conclusion*

For the reasons discussed, we *GRANT* Ford's motion to dismiss Risk's claims of discrimination and retaliation based upon the 1994 awards of overtime and her January/February 1995 reclassification and transfer, as those claims are barred by the appropriate statute of limitations. Also, we *GRANT* Ford's motion to dismiss Risk's claims of harassment, discrimination and retaliation based upon the conduct alleged in paragraphs 18 and 25 of the amended complaint, as those claims are beyond the scope of her EEOC charge. However, we *DENY* Ford's motion to dismiss Risk's claim of discrimination and/or retaliation based upon the conduct alleged in paragraph 21 of the amended complaint.[11]

It is so ORDERED.